# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JUDE ANNA SANTA ANA,

       Plaintiff,

v.                                                                            No. CIV 01-864 JP/LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

Plaintiff Jude Anna Santa Ana ("Santa Ana") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Santa Ana was not eligible for supplemental security income ("SSI"). Santa Ana moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. 9.]

Santa Ana was born on September 18, 1959 and was 39 years old when the administrative hearing was held. She completed the 11th grade and about 1½ years of college course work. Although she worked in the 1980's, she has no past relevant work experience. She apparently has two children living at home and is divorced. She alleges that the onset of her disability was January

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

27, 1996,[2] due to a back injury, mental impairment and stomach problems. [Doc. 10.] Santa Ana alleges that she cannot do any heavy lifting, and cannot sit, stand or walk for prolonged periods. She also contends that she has no motivation due to her depression.

On November 3, 1997, Santa Ana signed her second application for SSI benefits. Her application was denied at the initial and reconsideration stages, and she sought timely review from an Administrative Law Judge ("ALJ"). An administrative hearing was held on May 11, 1999. In a thorough and well-reasoned decision, dated June 16, 1999, the ALJ found that Santa Ana was not disabled within the meaning of the Social Security Act ("the Act") and denied the benefit request. Santa Ana challenged this determination to the Appeals Council which denied her request for review on June 1, 2001. This appeal followed.

## **Standards for Determining Disability**

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

---

[2]On April 5, 1994, Santa Ana filed a first application for SSI benefits alleging a disability due to musculoskeletal and mental problems. The ALJ denied her earlier request for benefits on January 26, 1996. She appealed the denial of benefits to the United States District Court but was unsuccessful. (CIV No. 97-1401 LH/RLP)

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[8] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[9] age, education and past work experience, she is capable of performing other work.[10] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[11]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F.

---

[5] 20 C.F.R. § 404.1520(b) (1999).

[6] 20 C.F.R. § 404.1520(c) (1999).

[7] 20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[8] 20 C.F.R. § 404.1520(e) (1999).

[9] One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[10] 20 C.F.R. § 404.1520(f) (1999).

[11] Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

3

Supp. 664, 669 (D. Kan. 1997). For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy. Id. at 669-670. Before applying the grids, the ALJ must first find the following: "(1) that the claimant has no significant non-exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category." Id. at 669 (*relying on* Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)). Non-exertional limitations can include mental impairments. The grids do not consider non-exertional limitations; therefore, if significant non-exertional limitations are present, the grids may not be applicable. Id. However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work." Id. (internal citations omitted.) In this case, the ALJ used the grids as guidance in reaching his determination of non-disability at step five of his analysis.

**Standard of Review and Allegations of Error**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal

standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After reviewing Santa Ana's medical and mental health records, symptoms and complaints (Tr. at 14-24), the ALJ rejected Santa Ana's claim for SSI at step five, concluding that she had the RFC to perform a full range of sedentary work, that was available in the national economy. (Tr. at 22-24.) In reaching this decision, Judge John J. Wren made the following findings before utilizing the Medical-Vocational Guidelines ("grids"): (1) Santa Ana had not engaged in substantial gainful activity since her alleged onset date; (2) Santa Ana had a "severe" impairment with respect to her status post fusion at L4/5; (3) the severe back condition did not meet a Listing; (4) her mental impairment was non-severe, after an analysis of the Listings and related Criteria under § 12.00; and (5) Santa Ana had the RFC to perform a full range of sedentary work. Judge Wren noted that Santa Ana had no past relevant work, and proceeded to discuss the Commissioner's burden to demonstrate that she could perform other work existing in significant numbers in her region. [Tr. at 22.] At the fifth step of the sequential analysis, Judge Wren applied the grids, finding that there were no non-

5

exertional impairments that reduced her RFC below the full range of sedentary work.. Therefore, the ALJ concluded that Santa Ana was not disabled since she could perform other work available in the economy. [Tr. at 22-23.]

In this appeal, Santa Ana asserts that the case must be reversed and remanded for two reasons: (1) the ALJ's decision that Santa Ana's mental impairment was non-severe was not supported by substantial evidence, and (2) Judge Wren's reliance on the grids was contrary to law. [Doc. 10.] The Commissioner claims the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations. [Doc. 11.]

After a review of the entire record, this Court is uncertain whether substantial evidence supports the ALJ's finding that Santa Ana's mental impairment was non-severe at step two of the sequential analysis and/or whether the ALJ made the required step two finding with respect to her mental condition. In addition, even if it were assumed that Santa Ana met her burden at step two supporting a finding that her mental impairment was severe, the ALJ's exclusive application of the grids, under that scenario, may have been erroneous. Therefore, the Court recommends that this case be remanded for a further hearing and findings, consistent with this opinion.

## Summary of Santa Ana's Medical Care/Conditions

One of the earliest medical records contained in the record is dated May 14, 1996 and documents Santa Ana's visit to the UNM Health Center with complaints of insomnia that had worsened over the past several weeks. [Tr. at 136.] She was rated "normal, not at all ill" on the "Clinical Global Impression Scale, Severity of Illness." [Id.] She was prescribed Trazodone for sleep.

On August 20-23, 1996, she was admitted to the health center because she had reportedly threatened the life of her case worker at Human Services after learning that the case worker had terminated or discontinued Santa Ana's case. [Tr. at 124.] Upon admission, Santa Ana admitted that she had smoked two joints and drank a beer "to calm herself down." [Id.] The discharge summary reflects that Santa Ana "supposedly has a long history of disorder sleep, anxiety, threatening and impulsive behavior and mood instability." [Tr. at 124.] She reported that she had been physically violent towards her father, her stepfather, her ex-husband and her boyfriend. Dr. Hammond (psychiatrist) recorded that her thought form was "circumstantial, logical and goal directed" and her thought content included "comments about chronic anxiety." She did not exhibit psychotic symptoms but admitted to chronic suicidal ideation. She "admitted to homicidal ideation, but denied any intent." [Id.]

After being admitted, Dr. Hammond noted that she settled in quickly and never appeared depressed. "Her affect was generally happy," and she was active on the ward. She tended to be immature and "smart-alecky," but overall was cooperative. During her admission, there was no evidence of a major mood disorder but her overall behavior was consistent with a borderline personality disorder. [Tr. at 125.]

On September 20, 1996, she was less irritable and had a much brighter affect. [Tr. at 121.] On December 11, 1996, Santa Ana told Dr. Hammond that she was doing OK. She had no complaints, her sleep was OK, and she denied depression. [Tr. at 119.]

On February 1, 1997, she insisted on being admitted because she stated she was going to kill her boyfriend's son. [Tr. at 116.] She believed that her young daughter was raped by her boyfriend's 17 year old son during the Thanksgiving holiday and that he was getting away with it. Santa Ana also

7

reported her own history of sexual abuse by her father. She was intoxicated and stated that she drank a one quart beer and uses "pot when [she] can afford it." [Tr. at 112, 116.] Her medical history on that date showed polysubstance use, including cocaine, alcohol and marijuana. She reported she was raped in 1976. She had back surgery in 1974. [Tr. at 112-15.]

On February 3, 1997, she felt fine and wanted to be discharged. [Tr. at 111.] On March 19, 1997, she reported to Dr. Hammond that she was having increased anger and irritability. He noted that she was unable "(or unwilling)" to pinpoint any stressors. She did not believe the current medications were sufficient and suggested Paxil, which was prescribed. [Tr. at 108.]

On April 10, 1997, a UNM Department of Orthopeadics medical record notes that she sustained a "LV burst fracture in 1974, and had fusion in this region." She was followed at six month intervals for chronic low back pain. She was referred to the Pain Clinic in the past but "was unable to comply with her schedule and physical therapy. She was unemployed. She reported no change in the nature of her back pain, no numbness, weakness or tingling in her lower extremities. She could walk with good balance, could toe and heel walk with ease, and there was no point tenderness in her back. [Tr. at 168.] She declined the option of the Pain Clinic.

On April 11, 1997, she began complaining of nausea and reported she could not keep much down. She also stated she had a similar episode near Easter that had spontaneously resolved. [Tr. at 185.] On April 30, 1997, she continued to complain of vomiting. [Tr. at 182.] An ultrasound was performed in May 1997, and it revealed gallstones. [Tr. at 167.] In mid-May, she continued to complain of vomiting. [Tr. at 161, 162.]

On June 5, 1997, she reported nausea but no vomiting. [Tr. at 177.] On June 7, 1997, she was doing OK, but told Dr. Hammond that her sadness and anger continued to be a problem, which

8

usually were related to family or Human Services' issues. She was still able to manage her children, two of whom were at home. [Tr. at 107.]

Santa Ana was given a multi-disciplinary treatment plan on July 24, 1997 that reflected a history of mood swings, with anger, poor impulse control, irrational behaviors, poor judgment and associated disruption. [Tr. at 101.] She was given a diagnosis of borderline personality disorder. Records also showed that she had been "marginally compliant with treatment and ha[d] been relatively stable on outpatient pharmacologic management for the past several years. . . ." The record documented that she was resourceful and had independent living skills. [Tr. at 105.]

On September 12, 1997, she reported to Dr. Hammond that she had a recent incident with the police where she apparently was speeding and trying to avoid arrest. Otherwise, she was keeping her anger under control. Dr. Hammond noted that "the meds help when she takes them." [Tr. at 100.] She again visited the ER in September and complaining of vomiting. [Tr. at 152, 147, 144.]

After films were taken in September 1997 for complaints of abdominal pain, Dr. Sullivan reported that there was marked abnormality of the lower thoracic spine shown and that there might be pseudo arthrosis between the L-4/L-5 disc space. [Tr. at 150.] The films did not seem to determine the source of her abdominal discomfort.

In October 1997, she reported increased anger to Dr. Hammond and visited the ER again for vomiting. [Tr. at 99, 140.] In December, she had a upper endoscopy done that was normal. [Tr. at 139.]

On November 3, 1997, she signed her SSI application and filled out the disability report. [Tr. at 62, 65-72.] In the report, her reported activities were preparing her kids for school, cleaning,

cooking dinner, and watching TV about four hours a day. She stated that she got along with people and that there were no changes in her personal care since her "condition" began.

Medical records in early 1998 indicate that she was doing all right and that she had better control over her anger. She was "therapeutically stable." [Tr. at 97, 96.]

In March 14, 1998, a RFC Assessment was done. [Tr. at 187.] She was given exertional limitations of lifting 20 pounds occasionally and 10 pounds frequently. She was able to stand/walk or sit about 6 hours per day. The medical consultant noted that she had not yet been surgically treated for gallstones and that her symptoms were "not characteristic" for gallstones. [Tr. at 188.] She had no other exertional limitations.

On April 29, 1998, Dr. Hunter saw Santa Ana. [Tr. at 208.] He noted that she appeared quite stable, was functioning well at home, and was "somewhat involved with therapy. She has more difficulty with her anger when she drinks. Hospitalizations are brief and stabilizing events." [Id.] Dr. Hunter provided Santa Ana's mental RFC assessment on May 4, 1998. [Tr. at 196-207.] He discussed her borderline personality disorder and related hospital admissions. He noted that her ability to comply with treatment varied. In addressing her most recent admission (February 1998), Dr. Hunter stated that her course most closely followed that to be expected by an individual who is a borderline personality and is intoxicated, and that once she was detoxed, she was released. [Tr. at 198.]

Dr. Hunter found that Santa Ana's history of depression and PTSD were in remission with treatment, and abstinence from drugs/alcohol. [Tr. at 202, 203.] He noted that she had a problem with anger but no problems with understanding and concentration. He concluded that because of her anger, she might have some limitations in social interactions. However, those limitations could be

10

partially managed by abstinence from drugs and alcohol and psychotherapy. Dr. Hunter did not find limitations in her ability to work. [Tr. at 198.] "[S]he would have no problems with adaptation in the workplace unless she was unable to control her anger in a particular situation."

On October 30, 1998, Santa Ana was seen by Dr. Hammond again. She was angry and upset after an argument with her daughter. Dr. Hammond reported that she had not taken her medications for a week and had been drinking heavily during the past six months. [Tr. at 95.] She was initially angry but later calm during the session. On November 2, 1998, she again was complaining of vomiting. Dr. Jamal noted that if further testing did not explain her symptoms, they would have to consider self-induced vomiting or medicine-induced vomiting. [Tr. at 214.]

There are very few medical records from 1999. On February 16, 1999, Dr. Hammond reported that Santa Ana was angry with Human Services because of problems with her food stamps. She initially told him that she planned to get a gun and shoot or beat up people at Human Services. She then admitted she did not have a gun and had a torn muscle in her abdomen that would prevent her from fighting anyone. Later in the day, Dr. Hammond called to check on Santa Ana. She said she was calmer after "getting stoned." [Tr. at 209.]

The administrative hearing was held on May 11, 1999, and the decision denying benefits was issued in June 1999.

On August 4, 1999, Santa Ana apparently attempted suicide by taking medications. She had an argument with her brother who had "pissed her off," and she wanted to end her life. She also was in the process of moving. The notes reflect that she became angry during the interview and walked out without discharge plans. The interviewer noted that she was stable when she left. [Tr. at 229.]

On September 14, 1999, she was admitted for several days when she presented by stating that she did not want to hurt herself. She came to the ER for a possible overdose of Trazodone and muscle relaxants, which she said she had taken impulsively. She also explained that she did not know how to handle her financial situation and was tired of taking care of herself and her children. The medical record documents that she has a history of substance abuse and most recently used some marijuana. [Tr. at 232.] By the next day, after being placed on her regular medications, she was much better and ready for discharge.

On October 12, 1999, she was doing OK and told Dr. Hammond that she was "staying out of trouble." The record notes that she was not on her meds because she could not afford them, although she could afford some beer and marijuana. She was living with her children and her mother. [Tr. at 228.] Her treatment plan review, dated October 21, 1999, shows that she was experiencing high levels of anxiety and hopelessness and that she needed continued pharmacological management. [Tr. at 227.]

I. **STEP TWO: SEVERE OR NON-SEVERE IMPAIRMENTS**

At step two, the decision maker decides whether the claimant "has a medically severe impairment or combination of impairments." Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988). "A severe impairment is one that interferes with basic work activities." Roberts v. Callahan, 971 F. Supp. 498, 500 (D.N.M. 1997). An impairment is not severe "if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," including walking, standing, sitting, lifting, hearing, seeing, speaking, understanding, carrying out simple instructions, use of judgment, responding appropriately to supervision and co-workers, and dealing with changes

in a routine work setting. 20 C.F.R. § 404.1521(b)(1-6). An impairment is not severe if it is only a slight abnormality with a minimal effect on the ability to work. Roberts, 971 F. Supp. at 500 (*citing* SSR 85-28).

> Presumptively, if the medical severity of a claimant's impairments is so slight that the impairments could not interfere with or have a serious impact on the claimant's ability to do basic work activities, irrespective of vocational factors, the impairments do not prevent the claimant from engaging in a substantial gainful activity. If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. If, on the other hand, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three.

Id. at 751 (*citing* Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287, 2291 (1987)).

Santa Ana argues that her alleged mental impairment should have been found "severe" rather than non-severe at step two of the sequential evaluation. In support of this position, she relies on medical records documenting her mental health counseling, depression, prescribed anti-depressant medication, multiple attempts at suicide, tendency to become angry and poor impulse control, hospitalization for "homicidal behavior," diagnosis of borderline personality disorder and a GAF of 50. She notes that a February 1998 record shows a bipolar disorder diagnosis and that she continued to need therapeutic psychiatric stabilization a that time to maintain an optimum level of functioning. Santa Ana also relies on her testimony that she does not cook, eat, sleep or clean when depressed. [Doc. 11.]

This Court's review of the medical records did not uncover any medical care provider statements indicating that Santa Ana's mental condition restricted her ability to work. In fact, the medical records do not appear to directly discuss her mental problems in relation to work. Nonetheless, Santa Ana's history of suicide attempts, homicidal threats, psychiatric hospitalization,

13

diagnosis of borderline personality disorder, psychiatric treatment and anti-depressant medication may be enough to satisfy the *de minimis* showing of severity required at step two of the sequential analysis. *Compare* SSR 85-28 (an impairment is not severe if it is only a slight abnormality with a minimal affect on the ability to work.) The Court recognizes, however, the medical records document that at least some of Santa Ana's problems regarding depression, anger and poor impulse control, threats to kill people and/or commit suicide are directly linked to her substance abuse and failure to take her medications.

Unfortunately, the ALJ's decision in this case does not permit this Court to determine whether or not substantial evidence supports a finding of non-severity at step two because it is unclear if the step two finding of non-severity was actually made. After throughly analyzing the Listing requirements under § 12.08, along with the A and B criteria of "personality disorder," Judge Wren appeared to conclude that Santa Ana's personality disorder was non-severe at step three of the sequential analysis, rather than step two. In his decision, he states: "The severity of claimant's mental impairment depends on the B-Criteria analysis." [Tr. at 16.] After finding Santa Ana did not meet the B-Criteria, he decided that she did not have a severe mental impairment. However, when an impairment is found to meet the detailed requirements of "severity" under the A and B Criteria of a Listing, the individual is considered disabled and further inquiry is unnecessary. In other words, the requirements of severity under Listing 12.00, at step three, are at a much higher level than the showing of severity necessary at step two. *See* Corber v. Massanari, 20 Fed.Appx. 816, 819-20, 2001 WL 1203004 at *2, n.2 (10th Cir. Oct. 11, 2001) (discussing the detailed levels of severity required during a step three analysis under Listing 12.04 and 12.06).

Because the Court is unable to determine whether a step two finding was made regarding Santa Ana's mental condition and/or whether substantial evidence supports such a finding, the Court remands this case for clarification and additional hearings and findings as needed. It is not this Court's intention to indicate there was or was not substantial evidence of severity at step two, or to usurp the ALJ's fact-finding authority. However, the Court requests that the ALJ clarify what fact two findings are being made with respect Santa Ana's mental conditions, and whether she satisfies the *de minimis* showing required. With that in mind, it might be helpful at a rehearing to ask Santa Ana directly what impairments, if any, prevent her from working and how those conditions limit her ability to work. In addition, the ALJ should look at whether a combination of impairments may interfere with her ability to work. Finally, should the ALJ determine that there is evidence of a mental impairment, the ALJ should consider whether he must complete a Psychiatric Review Technique Form (PRT Form). 20 C.F.R. § 404.1520a; Cruse v. United States Dept. of HHS, 49 F.3d at 614, 617-18 (10th Cir. 1995).

## II.     STEP FIVE:  APPLICATION OF THE GRIDS

The Court need not reach Plaintiff's second argument for remand since it has decided to grant Santa Ana's motion as to her initial argument. However, the Court notes that even if it assumed Judge Wren intended to find Santa Ana satisfied her burden at step two and then failed to meet the listing requirements at step three with respect to her mental condition, the ALJ's exclusive application of the grids may have been inconsistent and in error. This is true because exclusive resort to the grids is inappropriate when evaluating nonexertional limitations, such as a severe mental impairment. Grimiar v. Sullivan, 966 F.2d 1326, 1333 (10th Cir. 1992). Instead, under those circumstances, a vocational expert must be consulted to determine whether a significant number of jobs is available

in the national/regional economies that the claimant can perform despite the impairments. Cruse v. U.S. Dept. of HHS, 49 F.3d at 619. On the other hand, the ALJ may apply the grids without relying on a vocational expert if the ALJ determines the claimant has no significant impairments affecting her RFC. Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995); Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993).

In sum, a finding at step two that an impairment is severe means that the impairment "significantly limits [Santa Ana's] ability to do basic work activities, i.e., 'the abilities and aptitudes necessary to do most jobs.'" Williams v. Bowen, 844 F.2d 748, 752 (10th Cir. 1988). At step five, the grids cannot be applied conclusively if a plaintiff, as may be the case here, has nonexertional limitations that significantly limit her "ability to perform the full range of work in a particular RFC" category on a sustained basis. Teter v. Heckler, 775 F.2d 1104, 1105 (10th Cir. 1985). To decide otherwise might result in inconsistencies. For example, if it is determined that the plaintiff has a severe mental impairment, it follows that she cannot perform a full range of work in the sedentary category. Tafoya v. Barnhart, CIV No. 01-489 BB/DJS (D.N.M. April 30, 2002) [Recommended Disposition, Doc. 12] Therefore, it would be inappropriate to rely solely on the grids to find a claimant is not disabled, when the grids address only exertional impairments.

## Recommended Disposition

That Santa Ana's Motion to Reverse and Remand for Rehearing [doc. 9] be GRANTED and that the matter be remanded for proceedings consistent with the proposed findings.

Lorenzo F. Garcia
United States Magistrate Judge